# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

SHANNON GRAHAM, et al.      )
                                         )
            Plaintiffs,           )
                                           )
        v.                      )     Case No. 4:10-CV-00551-NKL
                                           )
TOWN & COUNTRY DISPOSAL OF       )
WESTERN MISSOURI, INC.,            )
                                           )
          Defendant.        )

# ORDER

Plaintiffs Shannon Graham, Jason Street, and all others similarly situated ("Plaintiffs") have sued Defendant Town & Country Disposal of Western Missouri, Inc., for violation of the Federal Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219 (2006). Pending before the Court are cross-motions for summary judgment [Docs. ## 141, 143]. For the following reasons, the Court denies Plaintiffs' motion for partial summary judgment [Doc. # 143] and grants Town & Country's motion for summary judgment [Doc. # 141].

## I.    Factual Background

Town & Country operates a for-hire motor carrier business based in Harrisonville, Missouri, that has contracts with cities, residents, and homeowners' associations in Kansas and Missouri to collect trash. All of Town & Country's trash trucks are registered with the United States Department of Transportation ("DOT"), and all the trucks display Town &

Country's DOT number. Town & Country is subject to inspections and audits by the DOT's Federal Motor Carrier Safety Administration ("FMCA"),[1] which regularly reviews and evaluates Town & Country's records. The most recent review and evaluation was in March 2011. Town & Country's drivers comply with the pre-trip and post-trip inspection requirements of the DOT and its hours of service limitations. [Doc.# 148 at 8-9].

Town & Country hired Plaintiffs as "throwers" working on its trash trucks for various periods of time between December 14, 2007 and December 14, 2010, having employed 170 individuals as throwers during that interval. *Id*. at 7. Throwers sometimes were assigned to a particular route, but were subject to being assigned to work anywhere in the Kansas City metropolitan area, in Missouri or Kansas. Upon completion of a trash collection route, the trash trucks on which Plaintiffs worked traveled to either the Lee's Summit Landfill in Missouri or back to Harrisonville. Town & Country maintained and dispatched its trash collection trucks each day from Harrisonville. *Id*. at 9-10.

As throwers, Plaintiffs were responsible for placing trash in the truck and for working with a driver, who was in charge of the truck. *Id.* at 11. Plaintiffs communicated with the driver through the use of hand signals. *Id*. at 13. As the trucks progressed along their routes, Plaintiffs were responsible for operating the truck's trash compacter mechanism when the back of the truck became full. [Doc. # 148 at 17]. Throwers were also required to wear brightly colored vests or shirts so they could be seen by traffic and seen by drivers as they

---

[1] The FMCA is the arm of the DOT responsible for motor carrier safety. 49 U.S.C.A. § 113.

assisted in backing up the trucks. *Id.* at 18. At no time has Town & Country conducted an investigation to assess its method of compensating its garbage throwers, and Town & Country does not have records of communications with the United States Department of Labor regarding compliance with the FLSA. Also, Town & Country does not maintain operations manuals, employee training manuals or handbooks, safety manuals, policy and/or procedure manuals, or job descriptions. *Id.* at 13.

In June 2010, Plaintiffs brought this action under the FLSA, 29 U.S.C. § 216(b) (penalizing employers that violate Section 207, the maximum hours provision) and assert compliance with 29 U.S.C. § 255(a) (requiring actions arising from willful violations to be commenced within three years after the cause of action accrued). This case was conditionally certified as a collective action on December 14, 2010. As of May 17, 2011, fifty current and former garbage throwers have opted in to this lawsuit by filing consents with the Court.

## II.    Discussion

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Rakes v. Life Investors Ins. Co. of Am.*, 582 F.3d 886, 893 (8th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986)). The moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). However, when a summary judgment motion is made and supported by evidence as provided in Rule 56(c), the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### A.  Whether the FLSA Applies to Town & Country

As a preliminary matter, the Court finds that the FLSA applies to Town & Country. Plaintiffs seek to recover for Town & Country's alleged violation of the FLSA's maximum hours provision, 29 U.S.C. § 207(a)(1):

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or *is employed in an enterprise engaged in commerce* or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

(emphasis added). To qualify as an "enterprise engaged in commerce or in the production of goods for commerce," a business must meet two requirements. First, it must have "employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person." 29 U.S.C. §203(s)(1)(A)(i). 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b).

4

As Town & Country employees routinely cross state lines to collect trash for the business, the company is clearly involved in interstate commerce.[2] Second, the business must have an "annual gross volume of sales made or business done [that] is not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(ii). Because Town & Country also has gross annual operating revenues in excess of $500,000, it qualifies as an enterprise engaged in commerce under the terms of section 203.[3] Thus, the Court finds that the FLSA applies to Town & Country, regardless of whether it engages in the production of "goods" for commerce as defined in this chapter. The Court also addressed this issue when it denied Town & Country's Motion to Dismiss. [Doc # 24 at 4-6].

## B. Whether Town & Country is Exempt under the Motor Carrier Act

Since Town & Country is an enterprise covered under the FLSA, the pertinent inquiry before the Court is whether Town & Country is exempt under the Motor Carrier Act[4] from

---

[2] "Highway transportation by motor vehicle from one State to another, in the course of which the vehicles cross the State line, clearly constitutes interstate commerce under both [the FLSA and the Motor Carrier Act]." 29 C.F.R. § 782.7(b)(1). Courts have found the existence of interstate commerce if the "activities of the individual plaintiffs involved interstate travel of a character that was more than de minimis. *Dauphin v. Chestnut Ridge Transp., Inc*., 544 F. Supp. 2d 266 (S.D.N.Y.,2008). *See Morris v. McComb*, 332 U.S. 422, 1947) (finding that the ICC had jurisdiction over a motor carrier whose trips within interstate commerce comprised only three to four percent of its overall business).

[3] Under the FLSA, an enterprise is defined as "the related activities performed. . . by any person or persons for a common business purpose." This definition applies to Town & Country and its employees, as they are engaged in a common purpose of commercial and residential trash collection within the Kansas City area.

[4] For purposes of the Motor Carrier Act, "[t]he term 'motor carrier' means a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). Because Town & Country collects and transports trash for a fee, Town & Country is clearly a motor carrier under the MCA, a fact which the parties do not dispute.

the FLSA's overtime requirements. The MCA exempts from this requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." *See* 29 U.S.C. § 213(b)(1).[5]  The employer bears the burden of proving the exemption applies, and the exemption is construed narrowly against it.  *See, e.g., Abel v. S. Shuttle Servs*., *Inc.*, 631 F.3d 1210, 1212 (11th Cir.2011); *Songer v. Dillon Res., Inc.,* 618 F.3d 467, 471 (5th Cir. 2011).

Department of Labor regulations apply the MCA exemption depending "both on the class to which [the employee's employer] belongs and on the class of work involved in the employee's job."  29 C.F.R. § 782.2(a).  To fall within the exemption, an employer must show it meets three criteria: 1) that it is an employer whose transportation of passengers or property by motor vehicle is under the jurisdiction of the Secretary of Transportation, 2) that the employee is a driver, driver's helper, loader or mechanic, and 3) that the employee engages "in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce."  *See* 29 C.F.R. §§ 782.2(a)-(b)(2).  Plaintiffs argue that Town & Country cannot show that it meets any of these elements.

### 1.    Whether the DOT has Jurisdiction over Town & Country

---

[5] 49 U.S.C. § 13501 allows the Secretary of Transportation to "prescribe requirements for--(1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation."

The Court must first determine whether Town & Country trash collection business is subject to the Secretary of Transportation's jurisdiction for transporting "property" under the MCA, thus satisfying the first element.[6]  The Department of Transportation has never issued regulations clarifying whether it considers trash to be property under the statute.  In the absence of such explicit regulations, the Court must look to the department's actions and practices to determine whether the Secretary has interpreted trash to be property.  *See Fed. Deposit Ins. Corp. v. Phila. Gear Corp.*, 476 U.S. 426, 438–39 (1986) (looking to the FDIC's longstanding practices to determine its interpretation of a statute in the absence of a formal interpretation).

Here, the Secretary clearly appears to be exercising jurisdiction over Town & Country's trash collection business, as it regulates Town & Country's operations from the registration to the inspection process.  Town & Country's trash trucks are all registered with the Department of Transportation and have a DOT registration number, which is displayed on all the trucks.  *See Baez v. Wells Fargo Armored Service Corp*. 938 F.2d 180, 182 (11th. Cir. 1991) (finding a permit issued to Wells Fargo by the Interstate Commerce Commission to signify the ICC's jurisdiction over the company under the MCA).  Further, Town & Country is subject to inspections and audits by the DOT's FMCA, which "regularly reviews and evaluates the Company's records."  [Doc. # 148 at 9]. The most recent review and evaluation occurred in March 2011.  *Id.*  It is uncontested that the

---

[6] The Court has already decided above that Town& Country is engaged in interstate commerce.

drivers of Town & Country's trash trucks all comply with the pre-trip and post-trip inspection requirements of the DOT, as well as with the DOT's hours of service limitations. *Id.* For the DOT to have the authorization to undertake such comprehensive oversight of Town & Country, the Secretary would have to assume jurisdiction under the MCA, which, to be proper, would require the Secretary to interpret trash as property. For a similar analysis, see *VanArtsdalen v. Deffenbaugh Indus., Inc.*, No. 09–2030–EFM, 2011 WL 1002027, *3 (D. Kan. March 18, 2011).[7]

Though the DOT has clearly assumed jurisdiction over Town & Country, the Court must still evaluate whether this assumption of jurisdiction is consistent with the text, structure and purpose of the MCA. Congress has never defined the term 'property' under the MCA. In cases of Congressional silence, the authorized agency generally possesses broad discretion in administering the law. *See e.g. Midwest Crane and Rigging, Inc. v. Federal Motor Carrier Safety*, 603 F.3d 837 (10th Cir. 2010).

The Court finds the DOT's interpretation reasonable under the statute for several reasons. First, the text of the MCA is silent as to the meaning of property. There is no indication that Congress intended property to have a narrow meaning under the Act. In fact, the ICC emphasized in its previous case law the broad meaning which is to be given to property under the MCA:

---

[7] Several cases cited by Plaintiff are easily distinguishable from the present case as there was little or no evidence in those cases that the DOT had asserted jurisdiction over the plaintiff's employer. *See e.g. Charlton v. Republic Services of Florida, L.P.* No. 09-22506-CIV, 2010 WL 2232677, at *9 (S.D. Fla. June 2, 2010).

"Property" is not defined in the Interstate Commerce Act and, as we noted in our prior report, the word is subject to many different meanings. "Property" connotes ownership as well as value. Something that is owned can be "property" notwithstanding its lack of economic value.

*Nuclear Diagnostic Laboratories Contract Carrier Application*, 131 M.C.C. 578, 580-81 (1979).

An interpretation of trash as property is reasonable under the natural and ordinary meaning of "property," which is not limited to goods with a positive economic value. For example, property has been defined as "any external thing over which the rights of possession, use, and enjoyment are exercised." Black's Law Dictionary (9th ed. 2009). Town & Country contracts with cities, residents, and homeowners' associations to carry their trash away for payment, assuming possession of the trash at pickup. Town & Country then uses the trash, particularly its collection and transportation, as its business, thus deriving value from its possession and control, even if temporary and not dependent on any economic value intrinsic in the trash itself.

Second, it is also reasonable to interpret the structure of the MCA as including trash within the reach of the statute. Trash is not present in the list of items specifically exempted from the DOT's jurisdiction within the plain text of the MCA. Some of the commodities listed as exempt, including wood chips and broken glass, are arguably similar enough to trash that it is reasonable to assume that Congress would have explicitly excluded trash from the MCA's jurisdiction if it had so intended. 49 U.S.C.A. § 13506; see also *VanArtsdalen,* 2011, *3 (stating that because the MCA excludes trash from the

items exempt from the DOT's authority, it is implied under traditional rules of statutory construction that Congress intended the DOT to have jurisdiction over trash).

Third, the regulation of trash companies by the DOT fits logically within the intended remedial purposes of the MCA. The MCA was designed with the goal of promoting safety on the interstate highways. *See Tooley v. Hill Truck Line, Inc*., 1992 WL 266605, at \*4 (D. Kan. 1992) ("The purposes of the Motor Carrier Safety Act was [sic] to promote the safe operation of commercial motor vehicles, to minimize danger to the health of operators of commercial motor vehicles and on other employees whose employment directly affects motor carrier safety, and to assure increased compliance with traffic law and with the commercial motor vehicle safety and health rules, regulations, standards, and orders issued pursuant to this Act." (internal quotation marks omitted)). Hauling garbage in large trucks creates particular safety hazards on the road, similar to trucks hauling traditional commercial goods. The fact that Congress has drawn distinctions between lighter trucks (weighing less than 10,000 pounds), which, as of 2005, are no longer exempt from FLSA's overtime requirements, and heavier trucks, which remain exempt, indicates that the type of good being carried is not necessarily the most critical factor when ensuring the safe transport of interstate commerce. Pub. L. 109-59, Sec. 4142(a); 49 U.S.C.A. § 31101. Other factors, including the size of the business, the degree of commerce it conducts interstate, as well as the presence of other regulators in the industry, also are important in assessing whether a given employer fits within the remedial purposes of the MCA. Cases cited by Plaintiff, such as *Goldberg v. Faber,* can

10

be easily distinguished because they lacked the same level of interstate commerce as the present case. 291 F.2d 232, 234 (7th Cir. 1961) (finding that truck drivers who did not cross state lines were not engaged in interstate commerce). Another case cited by Plaintiffs, in which the court found nonradioactive waste to not constitute property, also can be distinguished because the court there recognized explicitly that there were already several other regulators of the hazardous waste. *I. C. C. v. Browning-Ferris Industries, Inc.*, 529 F. Supp. 287, 293 (N.D. Ala. 1981).

Plaintiffs emphasize heavily the prior ICC decisions which had concluded that trash is not property on account of such factors as trash's 'negative economic value,' 'the essentially local nature' of the transportation, and the limited relation of such operations to the remedial purposes of the MCA. *See Joray Trucking Corp. Common Carrier Application,* 99 M.C.C. 109 (1965) (classifying rock and debris, which have a "negative value as a commodity" as non-property); *see also ICC v. Browning-Ferris Industries*, 529 F. Supp 287 (N.D. Ala. 1981) (relying on ICC decisions to hold that nonradioactive hazardous wastes were not property under the MCA).

However, the Court finds that prior ICC decisions are not consistent in their process of evaluating whether a particular type of waste constitutes 'property.' In fact, if there is a consistency within the ICC line of cases concerning waste, it is an emphasis on agency discretion and a case-by-case analysis of the specific circumstances of particular operations. This can be evidenced by looking at the post-*Joray* cases which found that radioactive wastes were property under the MCA despite having a clear negative value.

11

*Long Island Nuclear Service Corp. Common Carrier Application*, 110 M.C.C. 398 (1969); *Nuclear Diagnostic Laboratories, Inc., Contract Carrier Application*, 131 M.C.C. 578, 580-81 (1979).[8] In *Long Island*, the ICC indicated that having a negative economic value was not determinative of whether certain types of waste were property, as it admitted the radioactive waste at issue was just as worthless as the debris in *Joray*, but that the radioactive waste was property "because of the substantial and different public interest" created on account of the dangerous qualities of radioactive waste. 110 M.C.C. at 403-04. The ICC also claimed that its decision in *Joray* had been based on the " local character such as the disposal of debris and rubble and trash and garbage collection which appear in marginal purview of the remedial aims of the act." *Id.* The ICC emphasized in *Long Island* that in finding the *Joray* trash to be non-property, it had "exercised discretion in the administration of part II [of the Interstate Commerce Act]." *Id.*

The broad meaning ascribed to property by the ICC, combined with the agency's disparate weighings of its three factors in different cases, provides for a substantive consistency to be drawn between the ICC's analytical framework and the DOT's exercise of jurisdiction over Town & Country. The DOT certainly has the discretion to perceive of garbage trucks as posing a substantial safety danger on interstate highways, even if the ICC would have defined such activities as more of a local concern. It is clear from the uncontroverted facts in this case that

---

[8] This case, labeled *Nuclear Diagnostic II* and which declared radioactive waste as property under the MCA, came on the heels of a previous decision which had reversed the decision in *Long Island*, declaring radioactive waste to not constitute property because the safety concerns were being addressed by other regulations. *Nuclear Diagnostic Laboratories Contract Carrier Application*, 129 M.C.C. 339 (1978)

Town & Country spends a substantial portion of its business engaging in interstate transportation, and the safety of its collection and hauling operations are certainly a matter of concern across state lines on a daily basis. Thus, even if analyzing Town & Country's operations using the three-factors highlighted in *Joray*, the Court finds the DOT's exercise of jurisdiction to be reasonable as a means of regulating the safety of public highways within interstate commerce.

### 2. Whether the Plaintiffs were "Loaders" Engaged in Safety Related Activities

Now that Town & Country has shown that DOT has exercised proper jurisdiction over Plaintiffs, Town & Country must also show that Plaintiffs meet the second and third requirements for the MCA exemption: namely, that Plaintiffs were "loaders," or "driver's helpers," as defined by the MCA and were engaged in activities directly affecting the safety of operations of motor vehicles within interstate commerce. 29 C.F.R. § 782.2(b)(2).

"A "loader" is an employee of a carrier whose duties include, among other things, the unloading and transfer of freight, and the proper loading of his employer's motor vehicles so that they may be safely operated on the highways of the country. 29 C.F.R. § 782.5(a). A "loader" engages in work directly affecting the "safety of operation of motor vehicles" so long as he has responsibility when such motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized. 29 C.F.R. §

782.5(a).  An employee who has no responsibility for the proper loading of a motor vehicle is not within the exemption as a "loader" merely because he furnishes physical assistance when necessary in loading heavy pieces of freight.  29 C.F.R. § 782.5(c).  For example, the following activities provide no basis for exemption: unloading, placing freight in convenient places, and loading vehicles for trips which will not involve transportation in interstate commerce.  29 C.F.R. § 782.5(c).

The parties agree that as throwers, Plaintiffs were responsible for working with a driver and riding on the truck, for placing trash in the truck, and for operating the trash compacter when the back of the truck became full.  Plaintiffs were also required to wear brightly colored vests or shirts so they could be seen by traffic and they communicated with the driver through the use of hand signals to assist with backing up the trucks.

The facts show that Plaintiffs made decisions about whether the items left for pick up were acceptable for loading into the trash collection trucks.  For example, Plaintiff McKinney testified to a variety of objects that were not to be loaded in the trucks, particularly ones that pose safety hazards to the employees and the public:

> Q.  Well, you weren't supposed to take tires, correct?
> A.  Correct.
> Q.  You weren't supposed to take batteries?
> A.  Correct.
> Q.  You weren't supposed to take gasoline?
> A.  Correct.
> Q.  You weren't supposed to take any sort of cleaning solvent that might be combustible or something like that, correct?
> A.  Correct.
> Q.  You weren't supposed to take anything that could pose a fire hazard, correct?
> A.  Correct.

Q. You weren't supposed to take something that might be some sort of chemical which could harm you?
A. Correct.
Q. You weren't supposed to take any sort of chemical or paints that might drip out of the truck, correct?
A. Correct.
Q. You weren't supposed to take anything that would damage someone's property?
A. Correct.

[Doc. # 142-2 at 3].

The Court finds that when Plaintiffs decided what items were to be picked up and placed in the trash trucks, they exercised their judgment and discretion in placing, distributing, or securing the trash in such a manner that the safe operation of the vehicles on the highways in interstate commerce would not be jeopardized. *See* 29 C.F.R. § 782.5(a). Indeed, the court's holding in *VanArtsdalen* is directly applicable here. In that case, the plaintiff, who loaded trash onto trash trucks, filed an FLSA collective action against his employer. The court found:

> This is not a case where Plaintiff's driver or some other supervisor was walking next to him telling him that this piece of trash is acceptable, but this one is not; rather, Plaintiff was having to determine if the trash he encountered at each stop . . . could be safely loaded. . . . Plaintiff was . . . exercising his judgment and discretion when loading the truck.

*VanArtsdalen*, 2011 WL 1002027, at *3.

The Court notes that the parties in this case dispute whether Town & Country trained its throwers as to what items were acceptable for pick-up due to safety reasons. However, the Motor Carrier Act exemption does not require that the employer provide such training, but rather that their employees were required to exercise their discretion in this regard.

Additionally, although Plaintiffs may have exercised such discretion in performing only part of their duties, that does not render the Motor Carrier Act exemption inapplicable to them during all times of their employment as Town & Country's throwers.

> As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is…called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities, . . . he comes within the exemption in all workweeks when he is employed at such job.

29 C.F.R. § 782.2(3).

The parties also dispute the reason behind the throwers' decisions to place certain items in the truck or leave them on the curb. The Plaintiffs argue that these decisions were motivated by safety concerns at the landfill rather than concerns about safety on the highway. However, it is not reasonable to assume that a decision to avoid mixing flammable items such as gasoline with the rest of the trash in the truck would not have direct and important safety effects to drivers and pedestrians on the road, even if it would also have environmental and safety effects at the landfill. Other evidence provided by Plaintiffs also supports a finding that the throwers had discretion over safety-related activities, including one plaintiff who testified that he avoided loading items which could damage someone's property and avoided loading chemicals which could drip out of the truck and onto the roadways.[9] [Doc. # 142-2

---

[9] Plaintiffs cite cases from New York federal district courts to argue that "a defendant generally must present evidence as to the character of the activities of each plaintiff in order to determine whether he or she is subject to the [MCA] exemption. However, Plaintiffs fail to note that these same cases acknowledge the U.S. Supreme Court ruling that recognizes that in situations where "interstate travel constitutes a "natural, integral and ... inseparable part" of the employees' duties, such that any employee is likely to be called on to perform interstate travel, " such an individualized finding is not required. *Dauphin v. Chestnut Ridge Transp.*, Inc., 544 F. Supp.2d 266, 274 (S.D.N.Y. 2008); *Morris v. McComb*, 332 U.S. 422, 433 (1947)).

at 3].

As the Court finds that the Plaintiffs were sufficiently classified as "loaders" within the meaning of the Motor Carrier Act, and engaged directly in activities affecting safety, it does not discuss whether Plaintiffs could also be "driver's helpers."[10]  Thus, as a matter of law, Plaintiffs have no viable FLSA claims because Town & Country is exempt from complying with the FLSA under the Motor Carrier Act exemption.

## III.  Conclusion

Accordingly, it is hereby ORDERED that Plaintiffs' motion for partial summary judgment [Doc. # 143] is DENIED and Town & Country's motion for summary judgment as it relates to the FLSA overtime claim [Doc. # 141] is GRANTED.  Because Graham alleges an FLSA claim for failure to pay minimum wage, the case will remain open for determination of that issue.

 s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: September 20, 2011
Jefferson City, Missouri

.

---

[10] However, because of testimony by several Plaintiffs concerning their duties in regularly assisting the driver in safety backing up the trash truck, evidence points strongly in favor of the throwers also falling into the category of 'driver's helper.'